***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. Maryland Casualty Insurance Company, now Zurich Commercial Insurance was the carrier on the risk at the time of the alleged 14 January 1999 injury.
3. On 14 January 1999, plaintiff was employed by defendant-employer as a truck driver.
4. On 14 January 1999, plaintiff's average weekly wage was $591.25 and his compensation rate was $394.17, subject to a Form 22.
5. On 14 January 1999, plaintiff was involved in an accident arising out of and in the scope of his employment. Defendants deny that plaintiff was injured and that the accident resulted in any disability.
6. The parties stipulate into evidence as Stipulated Exhibit #1, the Pre-trial Agreement, as modified by the parties.
7. The parties stipulate into evidence as Stipulated Exhibit #2, a packet of Pre-trial exhibits.
8. The parties stipulate into evidence as Stipulated Exhibit #3, additional medical records.
 ***********
Based upon all the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 54-year-old man who earned his GED in 1983. Prior to returning to North Carolina in 1992 or 1993, plaintiff worked in physically demanding jobs, including driving a tractor-trailer truck. On or about 11 November 1998, plaintiff began working for defendant-employer as a truck driver. Plaintiff's primary duty was to drive for defendant-employer, but he also performed other tasks such as oil changes, mechanic work, running parts, and running errands.
2. On 14 January 1999, plaintiff was operating a dump truck for defendant-employer. The truck was loaded with clay which plaintiff dumped by raising the bed. The bed stuck in an upright position and the truck tipped over onto its passenger side. Plaintiff fell across the cab of the truck and struck the side of his head on the passenger window. Plaintiff was transported by EMS to the Womack Army Hospital on the day of the accident. Plaintiff was diagnosed with muscle spasm to the neck and back, was given medication for pain and was discharged without any work restrictions.
3. Plaintiff returned to work on 15 January 1999, but his pain increased. He continued to work for defendant-employer until approximately 10 February 1999. On 10 February 1999, plaintiff presented to his family physician, Dr. Gerard J. O'Donnell, with complaints of headaches, left-sided neck pain, left shoulder and arm pain and left hip pain, which plaintiff related to the 14 January 1999 accident.
4. Arnold Houston, plaintiff's supervisor at defendant-employer, testified that he saw plaintiff a minimum of 2-3 times per day and that plaintiff never complained to him, nor did he ever observe plaintiff having difficulties performing his job duties. Mr. Houston further testified that after 10 February 1999 plaintiff just failed to show up at work. Mr. Houston was never given a doctor's note from plaintiff, nor was he contacted by plaintiff and told why he had failed to return to work. Mr. Houston just assumed that plaintiff had voluntarily quit his job with defendant-employer.
5. Plaintiff has had two prior workers' compensation claims. In approximately 1981, plaintiff injured his lower back and had a laminectomy at L4-5. Plaintiff was out of work for approximately four years after this industrial accident. Plaintiff injured his neck in another on-the-job accident on or about 7 November 1990. He underwent a C5-6 anterior spinal fusion in approximately 1991. Plaintiff was out of work for over three years following this industrial accident.
6. Plaintiff testified at the hearing before the Deputy Commissioner that he returned to work without problems shortly after his cervical surgery in 1991 and his lower back surgery in 1981. Plaintiff's testimony on this issue is not credible.
7. Plaintiff also testified that he did not suffer from any lower back or leg symptoms following his recovery from lumbar surgery in 1981 and that he did not suffer from any cervical or arm symptoms following his cervical fusion surgery in 1991. Plaintiff's testimony on this issue is not credible. A review of the medical records reveals that plaintiff has consistently reported severe and disabling lower back and left leg pain, neck and left arm pain, and headaches. Plaintiff has reported to multiple medical providers that he experienced no relief from his lumbar and left leg pain after his 1981 lumbar surgery; and that he experienced no relief after his cervical surgery in 1991.
8. Plaintiff was first treated by Dr. O'Donnell, an internist, on 10 May 1993. following this examination, plaintiff continued to be seen and treated by Dr. O'Donnell on a number of occasions based upon plaintiff's subjective complaints of back pain from his previous surgeries, headaches, and continued left arm and neck pain. Dr. O'Donnell diagnosed plaintiff with chronic pain syndrome and was of the opinion that he did not expect plaintiff's symptoms to improve over time. Dr. O'Donnell's 1993/94 diagnosis of chronic pain syndrome was based upon plaintiff's continuing symptoms following his two prior work-related injuries and surgeries.
9. From 10 February 1999 through 16 August 2001, plaintiff continued to be treated by Dr. O'Donnell. Since 14 January 1999, plaintiff has undergone several diagnostic tests, including MRIs. The medical evidence indicates that plaintiff's injury of 14 January 1999 did not materially worsen his underlying condition. Plaintiff's most recent examination performed on 31 July 2000, by Dr. Samuel K. St. Clair, a neurosurgeon, revealed "no obvious high-grade cord compression or canal narrowing." Dr. St. Clair further opined that plaintiff did not show any conditions for which surgery would be recommended. Since Dr. O'Donnell, plaintiff's treating physician, referred plaintiff to Dr. St. Clair for further testing and plaintiff did have an increase in pain after his 14 January 1999 injury, these medical expenses were reasonably related to plaintiff's current claim.
10. Plaintiff has undergone several psychiatric evaluations and examinations. Plaintiff was evaluated by Dr. Gerald Windler, a psychiatrist with the UCLA School of Medicine. Among other things, testing by Dr. Windler suggested that plaintiff has a broad tendency to magnify the level of experienced illness and a characterological inclination to complain and be self-pitying. Plaintiff's psychiatric evaluations are not reasonably related to his compensable injury.
11. Plaintiff began working for Roberts Grading Landscaping in April, 1999. Plaintiff had his CDL and he operated trucks for Roberts Grading. He also drove and operated equipment; including bulldozers, backhoes, and trackhoes; moved heavy equipment; and performed landscaping work, including the application of grass seed, hay, and straw and some planting. Plaintiff testified that he worked between 20 and 30 hours per week for Roberts Grading. He testified that he was paid $10.00 per hour. However, in his interrogatory responses, plaintiff stated that he was paid $400.00 per week by Roberts Grading. Roberts Grading paid plaintiff in cash and kept no records as to amounts paid to plaintiff. Plaintiff kept no records as to amounts he earned. Plaintiff did not file tax returns for the years he worked for Roberts Grading. Therefore, there is no way to determine how much plaintiff earned working for Roberts Grading.
12. Plaintiff last worked for Roberts Grading in August 2001. He stopped working at that time because Roberts Grading had a downturn in its business and plaintiff's services were no longer needed. Plaintiff testified that he would return to work for Roberts Grading if and when he is called.
13. By plaintiff's estimate, he averaged 20 to 30 hours of work per week with Roberts Grading. Plaintiff would have and could have worked more, and therefore earned more, had the work been available. Plaintiff's diminished earnings do not reflect a diminution of wage earning capacity. The Full Commission therefore finds that as of the date he returned to work at Roberts Grading, plaintiff was capable of earning his pre-injury wages. Plaintiff's period of disability as defined by the Act ended upon his return to work on or about 1 April 1999.
14. Plaintiff has not engaged in a good faith effort to find suitable employment since he last worked for Roberts Grading. By plaintiff's own admission, he has applied for no jobs since he left Roberts Grading. The evidence shows, however, that plaintiff is capable of obtaining employment within his restrictions.
15. During the entire time plaintiff was working for Roberts Grading, he was also being treated by Dr. O'Donnell. Plaintiff reported to Dr. O'Donnell that he was not working, was unable to work, or had attempted to work but was unable to work. Plaintiff also told other medical providers that he was not working and was not able to work. Plaintiff was released to return to work by Dr. O'Donnell on 15 November 1999, with restrictions of no prolonged lifting or standing.
16. Although Dr. O'Donnell gave the opinion that plaintiff is unable to earn wages, it is clear from his testimony that he based his opinion upon incorrect assumptions. Dr. O'Donnell assumed that plaintiff had not worked since 14 January 1999, and could not work due to his pain and other physical restrictions. These assumptions were based upon false information provided by plaintiff. Therefore, no weight is given to Dr. O'Donnell's opinion on plaintiff's work capacity.
17. Plaintiff had pre-existing conditions involving his neck, left arm, lower back, left leg, and headaches. These were diagnosed as chronic pain syndrome and chronic cervical strain with radiculopathy. Except for the brief period of temporary aggravation from 14 January 1999 to 1 April 1999, plaintiff's complaints following the 14 January 1999 accident were identical to his pre-accident complaints. Based upon the greater weight of the evidence, plaintiff suffered a temporary aggravation of his pre-existing condition which lasted only until on or about 1 April 1999, when plaintiff returned to work for Roberts Grading.
18. On 14 January 1999, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer, resulting in the temporary aggravation of his pre-existing chronic pain syndrome.
19. As a direct and proximate result of plaintiff's 14 January 1999 injury by accident, plaintiff was temporarily and totally disabled from earning wages in his former employment or any other employment from 10 February 1999, until on or about 1 April 1999.
20. Pursuant to the stipulated Industrial Commission Form 22, plaintiff's average weekly wage on 14 January 1999 was $611.45, yielding a compensation rate of $407.66 per week.
21. Plaintiff is entitled to have defendants pay for the medical treatment necessitated by his 14 January 1999 compensable injury which resulted in the temporary aggravation of his pre-existing chronic pain syndrome, from 10 February 1999 through the completion of his diagnostic testing recommended by Dr. O'Donnell, including the testing and treatment provided by Dr. Samuel K. St. Clair on 31 July 2000.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On 14 January 1999, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer, resulting in the temporary aggravation of his pre-existing chronic pain syndrome. N.C. Gen. Stat. § 97-2(6).
2. As a direct and proximate result of plaintiff's 14 January 1999 injury by accident, plaintiff was unable to return to work earning wages in his former employment or any other employment from 10 February 1999, until on or about 1 April 1999. N.C. Gen. Stat. § 97-29.
3. Pursuant to the stipulated Industrial Commission Form 22, plaintiff's average weekly wage on 14 January 1999 was $611.45, yielding a compensation rate of $407.66 per week. N.C. Gen. Stat. § 97-2.
4. As a direct and proximate consequence of plaintiff's compensable injury of 14 January 1999, plaintiff is entitled to temporary total disability compensation at a rate of $407.66 per week from 10 February 1999, until he returned to work with Roberts Grading on or about 1 April 1999. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to have defendants pay for the medical treatment necessitated by his 14 January 1999 compensable injury, which resulted in the temporary aggravation of his pre-existing chronic pain syndrome, from 10 February 1999 through the diagnostic testing recommended by Dr. O'Donnell, including and until the examination performed by neurosurgeon Dr. Samuel K. St. Clair on 31 July 2000. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of Fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay temporary total disability compensation to plaintiff at a rate of $407.66 per week from 10 February 1999 until he returned to work with Roberts Grading on or about 1 April 1999. This amount which has already accrued shall be paid in a lump sum, and all amounts shall be subject to a reasonable attorney's fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of his compensable injury, from 10 February 1999 until 31 July 2000, including diagnostic referrals from Dr. O'Donnell.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff under Paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This the ___ day of September, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
DISSENTING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER